JOHN C. SHAFFER, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 1072.   Promulgated December 9, 1927.

*Chas. D. Hamel, Esq., Benjamin Saunders, Esq.,* and *George K. Bowden, Esq.,* for the petitioner.

*E. C. Lake, Esq.,* for the respondent.

OPINION.

TRAMMELL: Petitioner filed his original petition herein on December 13, 1924, asserting as error the refusal of respondent to allow a deduction for certain alleged bad debts. By leave of the Board, petitioner filed an amended petition on December 5, 1925, wherein

no reference was made to, nor claim asserted in respect of, any deduction for bad debts, but in which it was alleged as error that respondent had failed and refused to determine the proper March 1, 1913, value of a certain leasehold of elevator properties and had failed and refused to allow petitioner a proper deduction for exhaustion of its leasehold for each of the years involved. On motion granted by the Board on January 15, 1927, petitioner amended paragraph 5 of his amended petition, but did not materially change the allegations contained therein. At the hearing, counsel for petitioner stated in substance that the issues tendered in the original petition were abandoned, and that proof would be offered only on the issue contained in the amended petition. No evidence was offered touching the question of bad debts. The determination of the respondent in that respect is therefore approved.

In his amended petition, petitioner alleges that the value of his leasehold on March 1, 1913, was not less than $500,000, and that he is entitled to an annual deduction for exhaustion in the amount of $45,555.55. Respondent avers that said leasehold had no value at March 1, 1913, and that therefore petitioner is not entitled to any deduction for exhaustion. A single, clear-cut issue of fact is thus presented.

If petitioner's leasehold had any value at March 1, 1913, having been acquired prior to that date, he is entitled to a deduction for exhaustion in an amount equal to an aliquot portion of such value for each of the years 1918 and 1919. *Appeal of Grosvenor Atterbury*, 1 B. T. A. 169. The respondent raises no issue on this point, but contends that petitioner is not entitled to any deduction on account of exhaustion solely for the reason that his leasehold had no value as of March 1, 1913. With this contention, we are unable to agree. The evidence of record clearly and conclusively establishes that the leasehold in question had a very substantial value on that date. However, the problem of determining with reasonable accuracy the definite amount of such value is not so easily solved.

This lease enabled the petitioner to operate his grain business at an average annual profit of more than $125,000, upon a capital investment of approximately half a million dollars, and without the leasehold such business could not have been operated profitably.

In the process of determining the value of the leasehold in question, an element of vital importance is the life expectancy of the lease contract or the remaining length of time it had to run from March 1, 1913. The value of the leasehold depends largely on the term over which it was to run.

The evidence discloses that it was intended by the parties that the term of the lease should be coextensive with the term of the contract

under which petitioner sold the property to the railway company, and that the lease should cease and terminate at the same time that said contract by its terms should cease and terminate. To ascertain the life of the lease, we must, therefore, look to the terms of the sale contract. Under that contract, the railway company agreed to pay the purchase price of $1,000,000 in monthly installments equal to 2 cents per 100 pounds on the grain delivered by it to the elevators, together with the interest, but further agreed to pay during each year an amount equal to all interest and in addition at least $50,000 on the principal sum.

The bonds in the principal sum of $1,000,000, representing the purchase price to be paid by the railway company, were payable at and matured on October 1, 1924, but contained the provision that they should be redeemable on any interest-paying date at par and accrued interest. In other words, the term of the lease was 20 years unless the happening of a contingency shortened it. The lease provided that the term should be the time provided in the contract of purchase of the leased premises. The railway company was to pay the purchase price from freight receipts. In each year, beginning October 1, 1904, the railway company was to pay 2 cents on each 100 pounds of grain shipped into the elevators over its railway from points west of Joliet, Ill., or carried by it 40 miles or more, except that at least $50,000 and interest should be paid each year. During the period from 1904 up to 1913, under the terms of this contract, judging by conditions then existing and the amount of freight so handled, it would have required more than 20 years to complete the payments out of the freight receipts alone. The railway company was primarily interested in profits to be derived from the transportation of grain. The operation of the elevators was only incidental to and as an aid in securing freight business for the railway company. In 1913, the date as of which the value of the leasehold is to be determined, more than eight years had run, during which time the railway company had carried out the provisions of the lease contract by making the minimum annual payments set out therein. During that period, no question or controversy had arisen with respect to the redemption of the bonds prior to their maturity at the end of the 20-year period. The railway company, during that period, had not redeemed the bonds, and the lease actually ran for 20 years. Upon consideration of all the evidence in the case, we believe it was the intention of the parties in 1913, as in 1904, that the lease should run until 1924.

In determining the value of this leasehold, another element for consideration is the restrictions imposed by the contract on the lessee.

These related mainly to the giving of preference to the Rock Island Railway in the shipment of grain into and out of the elevators, and the requirement that at least 5,000,000 bushels per year should be delivered by the railway company to the elevators. However, the lessee was not required to ship its grain over the lines of this railway unless its rates were as favorable and its service as efficient as those of other railroads. Bearing in mind the fact that these elevators were located directly on the Rock Island Lines in Chicago, which enabled that company to render an expedited service, particularly important in the grain business, and which also eliminated an onerous switching charge imposed by other lines, the preference restrictions do not appear to have been unfavorable to the lessee, nor to have materially detracted from the value of the leasehold. Also, considering the capacity of the elevators, the quantity of grain handled by them annually, and the other pertinent facts, the stipulation that 5,000,000 bushels of grain should be delivered by the Rock Island Railway each year does not appear to have been burdensome. From 1904 to the beginning of 1913, an average amount in excess of the minimum had in fact been so delivered, and no forfeiture had been exacted of the lessee. From the facts and conditions known or reasonably based on experience, it was not contemplated that any forfeiture would likely be exacted in the future.

Coming now to the matter of determining the value of the leasehold at March 1, 1913, we find that the evidence offered by the petitioner to establish such value varies widely.

For the years 1909 and 1910, the corporation operating the elevators paid to petitioner an annual rental of $20,000 and for the years 1911 to 1920 the corporation paid an annual rental of $36,000 and permitted the petitioner a certain limited use of the elevators. All the stock of this corporation was owned by petitioner. We do not regard these facts, standing alone, as a satisfactory basis for determining the value, but is the rental of $36,000 which was actually paid during the year 1913 and subsequent years by the corporation for the use of the elevators, under all the facts and circumstances, a fair and reasonable rental?

Witnesses for the petitioner testified that in their opinion the annual rental value at March 1, 1913, was $50,000, while petitioner testified that in his opinion the leasehold on that date had a value of $75,000 per year for the remaining life of the contract. The terms and conditions of this lease enter so largely into the question of determining its value, that we do not give great weight to opinions of rental value under conditions which are not shown to be similar.

It also appears from the evidence that in 1913 the Rosenbaum Grain Co. paid $30,000 per year for an elevator of 1,000,000 bushels capacity, and that in 1916 the Northwestern Railroad Co. leased its elevators of 10,000,000 bushels capacity to the Armour Grain Co. at a rental of $300,000 per year. Comparing the capacity of the South Chicago Elevators with the capacity of the elevators leased to the Rosenbaum and Armour companies, the value of petitioner's leasehold in 1913 was $135,000 per year. However, this evidence is not impressive as a criterion by which to measure the value of petitioner's lease in 1913, in the absence of information with respect to the comparative conditions and terms of the various leases involved.

The evidence further shows that upon expiration of petitioner's lease contract in 1924, the railroad company leased the elevators to petitioner's corporation for a period of five years at an annual rental of $34,488, which amount was reduced from March 12, 1925, to $33,300 in consideration of the lessee assuming and relieving the lessor of certain liabilities. Here the parties were again dealing at arm's length, in respect of the very property the rental value of which we are seeking to ascertain, although the transaction occurred more than eleven years subsequent to March 1, 1913. This new lease contract was made on the Missouri River basis, which fixed the annual rental at $34,488. This, in our opinion, establishes a minimum rental value as of 1913, but in 1924 depreciation had been sustained over a period of $11\frac{7}{12}$ years. We have no evidence upon which to determine the extent or rate of depreciation. The lease in 1913 had more than 11 years to run, while the 1924 lease had a term of only 5 years. We think that the rental value on March 1, 1913, for the lease in question, considering the fact that the property had depreciated from that date to 1924, was in excess of the rental value in 1924. On the Missouri River basis the rental was based on the value of the elevator properties not including the land. Considering all the evidence, we think that the rental of $36,000 which was actually paid to the petitioner in 1913, was a fair and reasonable rental value. The evidence as a whole tends to corroborate this valuation. The lease contract at that time had an unexpired life or term of $11\frac{7}{12}$ years, and the aggregate rental value on this basis, reduced to present worth as of March 1, 1913, gives substantially the amount which we have found was the fair market value of petitioner's leasehold at that date. This amount should be the basis for deductions on account of exhaustion, as indicated in our opinion hereinabove.

Reviewed by the Board.

*Judgment will be entered on 15 days' notice, under Rule 50.*